Slip Op. 19–50

UNITED STATES COURT OF INTERNATIONAL TRADE

XIPING OPECK FOOD CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Before: Richard K. Eaton, Judge

Court No. 17-00260

**OPINION**

[U.S. Department of Commerce's final results are sustained.]

Dated: April 26, 2019

*Yingchao Xiao*, Lee & Xiao, of San Marino, California, argued for Plaintiff.

*Mollie L. Finnan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of Counsel on the brief was *Brendan Saslow*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Eaton, Judge: Plaintiff Xiping Opeck Food Co., Ltd. ("Plaintiff" or "Xiping") moves for judgment on the agency record, pursuant to 19 U.S.C. § 1516a (2012), challenging the United States Department of Commerce's ("Commerce" or the "Department") final results of its administrative review of the antidumping duty order covering freshwater crawfish tail meat from China. *See Freshwater Crawfish Tail Meat From the People's Rep. of China*, 82 Fed. Reg. 47,469 (Dep't Commerce Oct. 12, 2017) ("Final Results"), and accompanying Issues and Dec. Mem. (Oct. 5, 2017), P.R. 142 ("Final IDM"). The period of review ("POR") was September 1, 2015 through August 31, 2016.

Xiping, an exporter of crawfish tail meat from China,[1] objects to Commerce's rejection of untimely filed surrogate country financial statements from Thailand. Plaintiff also contends that the South African financial statements, on which Commerce relied, were "insufficiently disaggregated," and, therefore, could not serve as a proper basis for a normal value calculation. *See* Pl.'s Br. Supp. Mot. J. Agency R., ECF No. 24 ("Pl.'s Br.") 1; Pl.'s Reply Br., ECF No. 28.

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012). Because Commerce did not abuse its discretion by rejecting the untimely filed financial statements, and Plaintiff failed to exhaust its administrative remedies when disputing the use of the South African financial statements. Commerce's Final Results are sustained.

**BACKGROUND**

In September 1997, Commerce issued its antidumping duty order on freshwater crawfish tail meat from China. *See Freshwater Crawfish Tail Meat From the People's Rep. of China*, 62 Fed. Reg. 41,347 (Dep't Commerce Aug. 1, 1997), *amended by Freshwater Crawfish Tail Meat From the People's Rep. of China*, 62 Fed. Reg. 48,218 (Dep't Commerce Sept. 15, 1997). On September 8, 2016, the Department published a notice of opportunity to request an administrative review of the order for the POR. *See Opportunity To Request Admin. Rev.*, 81 Fed. Reg. 62,096 (Dep't Commerce Sept. 8, 2016).

Petitioner, Crawfish Processors Alliance (the "Alliance"), responded to the notice and asked Commerce to review, among others, Hubei Nature Agriculture Co., Ltd. ("Hubei"),

---

[1] At the preliminary results stage of the 2015-2016 review, Commerce determined that Xiping, a non-mandatory respondent, had successfully established its eligibility for a separate rate. *See Freshwater Crawfish Tail Meat From the People's Rep. of China*, 82 Fed. Reg. 26,435, 26,436 (Dep't Commerce June 7, 2017). Xiping, however, "was not selected for individual examination" in the 2015-2016 administrative review. *See* Final Results, 82 Fed. Reg. at 47,470.

Yancheng Hi-King Agriculture Developing Co., Ltd. ("Yancheng Hi-King"), and Xiping, all Chinese producers or exporters of crawfish tail meat. *See* Req. Admin. Rev. (Sept. 30, 2016), P.R. 3 ("Alliance Req.") at 1-2. Hubei, having sold subject merchandise from China to the United States during the POR, asked for a review of its dumping margin. *See* Req. Admin. Rev. (Sept. 29, 2016), P.R. 2 at 2 ("Hubei Req.") at 2.

On November 9, 2016, Commerce initiated its review of eleven exporters and producers. *See Initiation of Antidumping and Countervailing Duty Admin. Rev.*, 81 Fed. Reg. 78,778 (Dep't Commerce Nov. 9, 2016); Alliance Req. at 1. The Department subsequently selected Yancheng Hi-King and Hubei as mandatory respondents for individual examination because they had "the largest volume of exports of subject merchandise during the POR." Respondent Selection 2015-2016 Antidumping Duty Admin. Rev. (Dec. 8, 2016), P.R. 31 ("Resp. Selection Mem.") at 5.

On November 29, 2016, Commerce provided interested parties the opportunity to comment on the surrogate country list, the selection of a surrogate country, and the selection of surrogate values. *See* Req. Surrogate County & Surrogate Value Comments & Info. (Nov. 29, 2016), P.R. 20 at 1 ("Req. Surr. Country Info."); Selection Surrogate Countries (Dec. 6, 2016), P.R. 24 (identifying Brazil, Mexico, Romania, Bulgaria, South Africa, and Thailand as potential surrogate countries with economic development similar to that of China). Hubei and the Alliance submitted comments concerning the selection of a surrogate country on March 3, 2017. *See* Surrogate Country Selection Comments (Mar. 3, 2017), P.R. 90 ("Hubei Comments"); Surrogate Country Selection Comments (Mar. 3, 2017), P.R. 91 ("Alliance Comments"). Hubei asked the Department to select "Thailand as the primary surrogate country for the factors of production and Spain for the import data for the valuation of live crawfish." Hubei Comments at 2. The Alliance, however, contested the suitability of Thailand as the primary surrogate, and urged the Department to choose

"South Africa as the primary surrogate for values other than whole crawfish and scrap." Alliance Comments at 4.

Although an interested party within the meaning of the statute, Xiping placed no information on the record and filed no comments. *See* 19 C.F.R. §§ 351.102(b)(29), 351.301(a) (2016); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373 (Fed. Cir. 2013) ("Non-mandatory respondents also have the option of voluntarily completing the antidumping questionnaire to seek individual investigation."). On March 17, 2017, Hubei and the Alliance timely placed surrogate value information on the record, reflecting their respective positions as to the most appropriate surrogate country. *See* Surrogate Values (Mar. 17, 2017), P.R. 96 ("Alliance Surr. Values"); Hubei Surrogate Values Submissions (Mar. 17, 2017), P.R. 98 ("Hubei Surr. Values"). The Alliance's record submissions covered whole crawfish; shell and scrap; overhead, SG&A,[2] and profit; and electricity, and included financial statements from the South African seafood processor Oceana Group (the "Oceana Report"). *See* Alliance Surr. Values Ex. 1-4. Hubei, in turn, submitted information from Thailand relating to imports[3]; labor statistics; brokerage and handling charges; inland freight charges; and water and electricity tariffs. *See* Hubei Surr. Values Ex. 1-5. Hubei did not, however, include any financial statements in its submissions.

[2] "SG&A" stands for selling, general and administrative Expenses. *See* 19 U.S.C. § 1677b(b)(3)(B).

[3] Hubei also submitted import data from Brazil, Bulgaria, Mexico, Romania, and South Africa, but urged the Department to rely on Thai data regardless. *See* Hubei Surr. Values at 2 ("[W]e have also included the [Global Trade Atlas] import data from Brazil, Bulgaria, Mexico, Romania, and South Africa for the POR, as well as the prior 5 years of data, and the calculation of proposed surrogate values for the inputs set forth above. To the extent that no import [data] is available from Thailand . . . , the Department should rely upon import data from Thailand from an earlier period or imports from another potential surrogate country.").

On June 7, 2017, Commerce published the preliminary results of its administrative review, with accompanying preliminary decision memorandum. *See Freshwater Crawfish Tail Meat From the People's Rep. of China*, 82 Fed. Reg. 26,435, 26,438 (Dep't Commerce June 7, 2017) ("Preliminary Results"); *see also* Prelim. Dec. Mem. (June 1, 2017), P.R. 123. In the Preliminary Results, Commerce selected Thailand as the primary surrogate country, but relied on financial statements from the South African seafood processing company Oceana Group (the "Oceana Report") to calculate surrogate financial ratios. Prelim. Dec. Mem. at 6. Additionally, Commerce used Spanish data to value whole crawfish input. Prelim. Dec. Mem. at 7.

In the Preliminary Results, Commerce calculated a rate for Hubei of 5.10 percent. *See* Preliminary Results, 82 Fed. Reg. at 26,437. On July 14, 2017, Hubei filed a case brief asking Commerce to either reopen the administrative record to permit the submission of Thai financial statements for consideration in the Final Results, or that Commerce place such information on the record on its own initiative. *See* Hubei Admin. Case Br. (July 14, 2017), P.R. 139 ("Hubei Br.") at 8; *see also* Compl., ECF No. 11, ¶ 10. In response, the Alliance filed a rebuttal brief. *See* Alliance Rebuttal Br. (July 19, 2017), P.R. 140 at ii ("The Department should reject Hubei Nature's request to reopen the record to permit the inclusion of additional Thai financial statements for the calculation of surrogate financial ratios. Hubei Nature had a full and fair opportunity to submit such information prior to the applicable deadline but did not do so.").

In the Final Results, issued on October 12, 2017, and in the accompanying Final IDM, Commerce "recalculated a dumping margin of 3.81 percent to Hubei Nature, and assigned the same to Plaintiff," as a result of revising its "calculation of the surrogate value for non-refrigerated inland freight expenses." Compl. ¶ 11; Final Results, 82 Fed. Reg. at 47,470. Commerce refused, however, to accept Hubei's Thai financial statements, and declined to place further information on

the record itself, citing the untimeliness of the potential submissions. *See* Final IDM at p. 12 of 13[4] ("In accordance with the statute, the Department's regulations and . . . practice, the Department provided interested parties sufficient time to place surrogate financial information on the record so that interested parties would have a full and fair opportunity to evaluate them and to submit comments and other data in rebuttal."). Therefore, Commerce's Final Results used Thailand as the primary surrogate country, and relied on the South African Oceana Report to calculate surrogate financial ratios.[5] *See* Final IDM at p. 12 of 13; Surrogate Value Mem. (June 1, 2017), P.R. 125 at 3, 5.

On October 31, 2017, Plaintiff filed a Rule 56.2 motion for judgment on the agency record in this Court, challenging Commerce's rejection of Hubei's request to reopen the record. *See* Pl.'s Br. 1. It is worth noting that Plaintiff makes this claim even though no party timely requested an extension of the original deadlines.[6] In its complaint, Plaintiff alleged that "[t]he Department's dumping margin calculation using Oceana Group's financial statement is arbitrary and capricious, and is an abuse of discretion under 19 C.F.R. § 351.302(b)." Compl. ¶ 13. Defendant responded to Plaintiff's motion, maintaining that Commerce's Final Results should be sustained, and Plaintiff's motion for judgment on the agency record should be denied. *See* Def.'s Resp. Pl.'s Mot. J. Agency R., ECF No. 25 ("Def.'s Br.").

---

[4] Because Commerce did not number the pages of the Final IDM, the actual page-count is indicated for ease of reading.

[5] Commerce also continued to rely on the Spanish data for whole crawfish, but the parties do not take issue with this. Final IDM at p. 3 of 13; Surrogate Value Mem. at 3.

[6] 19 C.F.R. § 351.302(b) gives Commerce discretion to extend time limits "for good cause."

## STANDARD OF REVIEW

Commerce's antidumping duty determinations, findings, or conclusions must be supported by substantial evidence and otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

Commerce's decision whether to reject an untimely filed submission is reviewed for abuse of discretion. *See Grobest & I–Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 98, 123, 815 F. Supp. 2d 1342, 1365 (2012) ("[T]he court will review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on the Department and the interest in finality."); *see also Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006) (discussing application of abuse of discretion standard in *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)).

## LEGAL FRAMEWORK

Commerce is charged with determining if goods are being sold, or are likely to be sold, in the United States at less than fair value. This determination is based on a comparison of normal value and export price. 19 U.S.C. § 1673. The dumping margin for the subject merchandise is reached by finding the amount by which normal value (home market price) exceeds export price (U.S. price). 19 U.S.C. § 1677(35)(A). This margin is then used to determine an antidumping duty rate.

When the merchandise in question is exported from a nonmarket economy country,[7] such as China, Commerce calculates the normal value of the subject merchandise based on the values

---

[7] A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C.

of the factors of production, adding an "amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). Additionally, Commerce uses "financial ratios derived from financial statements of producers of comparable merchandise in [a] surrogate country" to calculate the value of additional expenses and profit. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319-20 (Fed. Cir. 2010) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010)).

The statute directs Commerce to use the "best available information" to calculate normal value. 19 U.S.C. § 1677b(c)(1)(B). While the term "best available information" is not defined by the statute, "Commerce's discretion . . . is limited by the statute's objective of 'obtain[ing] the most accurate dumping margins possible.'" *Calgon Carbon Corp. v. United States*, 40 CIT __, __, 145 F. Supp. 3d 1312, 1323 (2016) (quoting *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1191, Slip Op. 04-88, (July 19, 2004) (not reported in Federal Supplement). Therefore, "Commerce's choice of the best available information 'must evidence a rational and reasonable relationship to the factor of production it represents' to be supported by substantial evidence." *Id.* Where, as here, values from a surrogate market economy are used, Commerce, "to the extent possible . . . [looks to] one or more market economy countries that are [1] at a level of economic development comparable to that of the nonmarket economy country, and [2] significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). By its regulations, Commerce has expressed a preference to base its factors of production values, including surrogate financial

---

§ 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004). Therefore, because the subject merchandise comes from the PRC, Commerce constructed normal value by valuing the factors of production using surrogate data from India. *See* 19 U.S.C. § 1677b(c)(4).

ratios, on information from one primary surrogate country. 19 C.F.R. § 351.408(c)(2); *see Dorbest*, 604 F.3d at 1368. Thus, Commerce will normally use secondary surrogate country information if information "from the primary surrogate country [is] unavailable or unreliable." *Jiaxing Brother Fastener Co. v. United States*, 38 CIT __, __, 11 F. Supp. 3d 1326, 1332-33 (2014), *aff'd,* 822 F.3d 1289 (Fed. Cir. 2016).

## DISCUSSION

### I. Commerce Did Not Abuse Its Discretion When It Refused to Permit the Untimely Submission of the Thai Financial Statements.

Prior to issuing the Preliminary Results on June 7, 2017, Commerce collected surrogate value information for valuing factors of production and calculating normal value. Commerce set a deadline of March 17, 2017 for the submission of information relating to factors of production. *See* Req. Surr. Country Info. at 2. The regulatory deadline for surrogate value information used in calculating normal value was "no later than 30 days before the scheduled date of the preliminary results," in accordance with 19 C.F.R. § 351.301. Req. Surr. Country Info. at 2; *see* 19 C.F.R. § 351.301(c)(3)(ii). As noted, as a non-mandatory respondent, Plaintiff was not required to place anything on the record, though it could have so chosen. *See Yangzhou*, 716 F.3d at 1373 ("Non-mandatory respondents also have the option of voluntarily completing the antidumping questionnaire to seek individual investigation."). Nonetheless, Plaintiff, as an interested party, was given notice of the opportunity to submit information, and was on record notice of Hubei's submissions. *See* Req. Surr. Country Info.; Selection Surr. Countries; Hubei Comments. Plaintiff concedes that neither it nor Hubei submitted surrogate financial ratios from Thailand by these deadlines. Pl.'s Br. 3 ("At the time[,] no financial statements from Thai seafood processing companies were present on the record."). The Preliminary Results were published on June 7, 2017.

*See* Preliminary Results, 82 Fed. Reg. at 26,435. On July 14, 2017, Hubei asked Commerce to reopen the record. *See* Hubei Br. 8.

Plaintiff contends that Commerce should have exercised its discretion to allow Hubei to place the Thai financial statements on the record, or, in the alternative, that Commerce should have placed Thai data on the record itself. *See* Pl.'s Br. 9 ("Commerce has discretion to accept factual information to value factors of production filed anytime."). In support of this argument, Plaintiff relies primarily on the *Grobest* case as persuasive authority. In *Grobest*, the Court determined that Commerce abused its discretion when it refused to permit a party to submit additional information after the deadline for such submissions had passed. *Grobest*, 36 CIT at 125, 815 F. Supp. 2d at 1367 ("[T]he court holds that in this case, the interests in fairness and accuracy outweigh the burden upon Commerce; therefore, Commerce's rejection of [the consolidated plaintiff's] late-filed submission was an abuse of discretion.").

Plaintiff argues that, although Hubei submitted the Thai financial statements after the submission deadline had passed, the superiority of the Thai data compelled Commerce to accept it. Pl.'s Br. 7-8, 11-12. Plaintiff's reliance on *Grobest* to make its case is misplaced, however, because there, the untimely information was submitted "more than seven months before Commerce released the preliminary results and one year before Commerce released the final result." *Grobest*, 36 CIT at 125, 815 F. Supp. 2d at 1367 (citation omitted). The long periods of time present in *Grobest* led the Court to conclude that "there [was] no concern with finality." *Id.* In this case, however, Hubei asked to submit the Thai financial statements more than a month *after* Commerce released the Preliminary Results. *See* Hubei Br. 8-9. Further, Xiping's claim is a little puzzling since it timely submitted no information for the record, despite being on notice of an

opportunity to do so, and it did not ask for an extension of the deadline. *See* Req. Surr. Country Info. at 2; 19 C.F.R. § 351.301(c)(3)(ii) (setting forth the relevant deadlines).

Plaintiff also emphasizes Commerce's preference for valuing factors of production using information from one surrogate country as a reason it should succeed. Pl.'s Br. 10 ("Commerce has a strong preference to value all [factors of production] in a single surrogate country."). For Plaintiff, this preference should override Commerce's concerns of timeliness. While it is true that Commerce "normally will value all factors in a single surrogate country," including surrogate financial ratios, Commerce is not bound by this preference when the information needed is "unavailable or unreliable." 19 C.F.R. § 351.408(c)(2); *Jiaxing Brother Fastener*, 11 F. Supp. 3d at 1333. Here, the Thai financials were simply not available because they were not on the record, even though Plaintiff and Hubei knew of their availability at least as early as March 3, 2017. *See* Hubei Comments at 3. That is, Hubei noted the existence of the Thai financials in its March 3, 2017 comments, which were placed on the record two weeks prior to the initial deadline of March 17, 2017, and more than three months prior to the Preliminary Results issued on June 7, 2017. *See* Hubei Comments at 3 ("[C]ontemporaneous and publically [sic] available financial statements for producers of comparable merchandise from Thailand are available to value the financial ratios for use in this proceeding segment."). These comments demonstrate that, had Hubei wished to place the Thai financials on the record prior to the deadline, it could have.

As for Xiping's argument that Commerce should have placed the information on the record itself, Commerce is not required to correct a party's omissions. "Commerce has authority to place documents in the . . . record that it deems relevant, [but] 'the burden of creating an adequate record lies with [interested parties] and not with Commerce.'" *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citation omitted) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United*

*States*, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992)). The Federal Circuit has also noted that a party who, as here, is responsible for the lack of timely submitted information, puts itself in an "awkward position" by arguing "that Commerce abused its discretion by not relying on evidence that [the party] itself failed to introduce into the record." *Id.* Here, there were usable financials on the record, and Hubei's observation that there were Thai financials "available to value the financial ratios" does not provide a sufficient reason for Commence to search out the information and place it on the record.

A party may request deadline extensions for good cause, but must submit such requests prior to the original deadline unless the party demonstrates extraordinary circumstances. *See* 19 C.F.R. § 351.302(b)-(c); *see also Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015) ("Here, Commerce properly exercised its discretion in rejecting Dongtai Peak's extension requests and Supplemental Responses because (1) the extension requests were submitted after the established deadline in violation of 19 C.F.R. § 351.302(c), and (2) Appellant failed to show 'good cause' for an extension as required by § 351.302(b)."). Commerce notes that neither Plaintiff nor Hubei asked for an extension or tried to demonstrate good cause for the delay in filing the Thai financial statements. *See* Def.'s Br. 11.

As noted, Hubei's Surrogate Country Comments, submitted on March 3, 2017, indicated that Thai financial statements were available to it at least two weeks prior to the initial deadline of March 17, 2017, and more than three months prior to the Preliminary Results. *See* Hubei Comments at 3. Nonetheless, neither Hubei nor Xiping made any attempt to place the Thai financials on the record until more than a month after the Preliminary Determination had been issued. Thus, here, unlike *Grobest*, Commerce was well on its way to making the Final Determination when Hubei tried to change the basis for a portion of Commerce's findings.

Therefore, here, unlike *Grobest*, finality is an issue and Commerce did not abuse its discretion by not accepting Hubei's late submission.

**II. Plaintiff Failed to Exhaust Its Administrative Remedies Regarding Insufficient Disaggregation in the Oceana Report**

Plaintiff's primary argument against Commerce's Final Results is based on the alleged deficiencies of the South African Oceana Report financial statements. Specifically, Plaintiff argues: "Oceana's annual report was unsuitable for lacking of sufficient disaggregation. . . . Oceana Group's financials are not only missing one of the most important cost categories - raw material costs - but are also beset by other anomalies that potentially distort the calculation of financial ratios." Pl.'s Br. 5 (footnote omitted).

Commerce urges the court to disregard this argument because Xiping failed to exhaust its administrative remedies. As Commerce points out, "Neither Xiping, nor any other interested party, ever made this argument to Commerce during the administrative proceeding." Def.'s Br. 14. A review of the record, including Hubei's brief requesting that Commerce accept the Thai financial statements, reveals no mention of insufficient disaggregation. *See* Hubei Br. 6-8. Unlike the issue of whether or not to permit the untimely submission of the Thai data, Commerce has had no opportunity to address the argument relating to disaggregation. The court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The court finds that Xiping and Hubei had ample opportunity to raise their concerns before the Department throughout the administrative proceedings. Therefore, the court does not reach the merits of this argument.

In addition, it is not clear that the Thai financials would be found to be the best available information even if they were on the record. In the 2013-2014 review of the underlying 1997 antidumping duty order, this Court approved Commerce's use of an earlier iteration of the Oceana

Report instead of similar, Thai financial statements, when both were on the record. *See Weishan Hongda Aquatic Food Co. v. United States*, 41 CIT __, __, 273 F. Supp. 3d 1279 (2017), *aff'd,* 917 F.3d 1353 (Fed. Cir. 2019); *see also Weishan Hongda*, 917 F.3d at 1367 ("Commerce . . . found that the Thai Financial Statements suffered from distortions due to export subsidies, and . . . explained that the Oceana Report was 'a viable alternative,' while addressing the challenges made to the Oceana Report. . . . [Further,] Commerce was able to use its normal methodology to 'calculate appropriate financial ratios,' despite the Oceana Report's failure to 'provide disaggregated expenses for raw materials or labor cost.'"). Because the Thai financials in this case were not timely placed on the record, it is, of course, not possible to determine whether they would have constituted better information than the Oceana Report. The *Weishan Hongda* case, however, indicates that Xiping's hoped-for finding would not be guaranteed.

Finally, it is worth noting what this case is not. It is not a case where Xiping or Hubei went back and forth with Commerce as to how to answer questionnaires or with respect to what should be on the record. Rather, here, both Xiping and Hubei were aware that the Thai financials were available to put on the record, but neither party sought to do so until it was too late.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's Final Results. Judgment shall be entered accordingly.

/s/ Richard K. Eaton
Richard K. Eaton, Judge

Dated: April 26, 2019
New York, New York